WALSTON H. BROWN, WILLIAM B. HOWARD, AND COLUM-
BUS R. CUMMINGS V. THE ESTATE OF CHARLES
P. DIBBLE, DECEASED.

*Consolidation of railroad companies[1]—Evidence—Donation note—
Construction of conditions.*

1. A consolidated railroad company assigned a donation note given
   to one of the corporations merged in the consolidation, on which
   the assignees brought suit.
   *Held,* that, unless the consolidated company was shown to be
   the *legally* created successor of the company to whom the note
   was given, it had no concern with its individual contracts with
   third persons; and, if so identified, it can only have or give to its
   assignees a right to recover by proof that all conditions of
   recovery have been complied with.
2. In this case it is held that there was no legal proof of such a con-
   solidation.
3. A donation note was given to a railway company in consideration
   of the proposed construction of a railroad from Toledo, Ohio, to
   Marshall, Michigan, and the erection of repair shops at the last-
   named city; payment being conditional upon the construction
   or securing of a *continuous* line of road between the points
   named, and the erection of the repair-shops.  The company built
   its road to Dundee, and secured the right to *use* the track and
   appurtenances of another road, from Dundee to Toledo, in *common*
   with the owner at a given rate for the first year, and after that
   at a higher rental, and a fair share of the cost of maintenance.
   The road over which such rights were thus secured was to remain
   in the possession and under the control of its owners, and all per-
   sons employed by *either* road were to be under the direction of,
   and subject to suspension or dismissal by, such owners.  This
   running arrangement was subject to termination on 30 days'
   notice upon any default, and after five years by the licensor, and
   after 18 months by the licensee; and all local business between
   Dundee and Toledo was to belong to the licensor.
   *Held,* that while it was not necessary that the payee in the note
   should literally build the road to Toledo, it was evidently
   expected that it should have a road under its own control cover-

---

[1] See *Wells v. Rodgers,* 60 Mich. 525.

ing the *entire* distance, and its repair-shops at Marshall for the *whole* road; the improvement being contemplated as a permanent one.

Error to Calhoun. (Hooker, J.) Argued February 15, 1887. Decided April 21, 1887.

Claim filed against estate of deceased person. Disallowed in probate and circuit courts, and claimants bring error. Affirmed. The facts are stated in the opinion.

*Miner & Stace* and *William H. Porter (John B. Cohrs*, of counsel), for claimants and appellants.

*J. C. FitzGerald (John C. Patterson* and *William H. Brown*, of counsel), for the estate.

CAMPBELL, C. J. Plaintiffs, who are railway contractors, presented a claim against the estate of Charles P. Dibble, deceased, for $5,000, upon an alleged agreement by him to pay to the Toledo & Milwaukee Railway Company half of that sum within 30 days after the construction of a railroad from Toledo to Marshall, and the other half when said company should establish and construct the general repair-shops of the road at Marshall. This contract was dated October 16, 1882. The declaration claims a performance on December 1, 1883, which was the limit of time fixed by the contract for the road to go into operation.

The Toledo & Milwaukee Railway Company was a Michigan company, organized in 1879 to construct a road from the State line, where crossed by the Toledo & Ann Arbor Railroad, to Allegan.

It is claimed that in October, 1883, the Toledo & Milwaukee Railway Company became consolidated with an Ohio company, called the Toledo & Michigan Railway Company, alleged to have been incorporated in Ohio, to construct and operate a railroad from Toledo to the point on the State line where the former road was to start. This new com-

bination was to be called the Michigan & Ohio Railroad Company.

On the twenty-third day of November, 1883, the consolidation entered into a contract with the Toledo & Ann Arbor Railroad Company to obtain the use of the line of the latter company from Dundee across the State line to Toledo, covering the entire and only line which the Toledo & Michigan Company had been organized to build, and the south-eastern part of the Toledo & Milwaukee road. The purpose was stated to be for—

"Avoiding the expense of building an independent track over so much of the line adopted by it as already covered by the track of the Ann Arbor Company."

The line to Marshall was made out by including this leased line. Plaintiffs claim as assignees of the consolidated company.

The claim was rejected by the commissioners for lack of sufficient evidence to sustain it, and in the circuit court, on appeal, a verdict was ordered for the defendant on several grounds, relating both to the sufficiency of the consolidation and the completion of the contract. There was also some question whether Mr. Dibble was shown to have delivered his agreement at all.

As the claim was tried before the estate commissioners as well as at the circuit, and as a new trial was refused at the circuit, it may perhaps be assumed as probable that the defects in proof did not arise from oversight. But as any ruling made on the present state of the record would not preclude a sufficient showing, if it is possible to make it, as against other parties, we shall not do more than seems desirable to settle the present controversy.

As the suit is brought by the assignees of a consolidated company on a contract made with an original and single company confined to this State, the question whether the consolidation is good for other purposes cannot settle this case.

Unless the consolidation is shown to be the legally created successor of the old Michigan company, it has no concern with its individual contracts with third persons; and, if so identified, it can only have or give to its assignees a right to recover by proof that all conditions of recovery have been complied with.

There is nothing in the record to show what the law of Ohio is concerning the organization or consolidation of railroad companies. The Toledo & Michigan Company purports to be organized under a voluntary agreement much more vague than would be allowed by our statutes, and which, while it is possibly good and sufficient to make a corporation in Ohio, is not shown to be so; and, had it been shown to be legally incorporated, the record is still defective in not showing that it could lawfully become amalgamated with a Michigan company, or that it could lawfully take a lease covering its entire proposed line, and abstain from building any part of it. Neither of these things can be presumed, and neither is shown.

There is also an entire failure to show, by legal evidence of any one knowing the facts, such a publication of notice to stockholders of the proposed meeting to bring about consolidation as is required by law. The records of the company do not show that evidence of a notice was perpetuated by an affidavit, as is allowed by article 2, § 3, of the railroad act (How. Stat. § 3317). No attempt was made to prove the publication of notice by any one connected with the papers, or by any one who had seen the notices, and could identify them. Mr. Neal, the secretary, who swore in a general way to the publication, showed on cross-examination that he knew nothing about it. As there is usually no difficulty in getting access to newspaper files, the case was not one for loose assumptions, and some form of legal proof should have been given.

The only proof of what was done at the meeting of the

Michigan company, held September 11, 1883, to consent to the consolidation, is a certificate of Mr. Neal, the secretary of that company, dated October 6, 1883. Whether this came from any book of records does not appear. By the recital of these preceedings it is stated that Mr. Latcha was made chairman and Mr. Neal secretary of the meeting, and that there were present 14,505 shares in person or by proxy; but who were present as holders, and who as proxies, does not appear. Mr. Latcha was sworn as a witness, but does not prove there was any such meeting. Mr. Neal, who purports to have been there as secretary, swears he was not there at all, and testifies that one Lamb held both his and Latcha's proxies. There was therefore no proof at all that the Michigan company did what it purported to have done.

Neither was it shown that the board provided for by section 30 of article 2 (Act No. 174, Laws of 1883), consisting of the Attorney General, Commissioner of Railroads, and Secretary of State, acted on and approved the consolidation. There is a certificate purporting to be signed by the Railroad Commissioner, Gen. Innes, and by Maj. Ransom, describing themselves as chairman and secretary of the "Board of Railroad Consolidation," but not signed by the Attorney General and Secretary of State. As there is no statute providing that the three gentlemen constituting the board shall organize under the name used, or appoint one of their number chairman, and employ a secretary not of their own number, we do not think that this certificate alone was sufficient, although it is quite probable the board really undertook to act.

Without deciding whether or not facts enough may have not existed to authorize a consolidation, there was no legal evidence of it, and therefore no cause of action was made out.

But, in one view of the case, it may be proper to consider whether, if there was a consolidation in law, there was any cause of action made out.

The Toledo & Milwaukee Railway was by its articles to begin at the Ohio state line, so as to have a continuous line of its own from Marshall to that point. Whether it would be allowed to continue to Toledo would be determined by the laws of Ohio, which are not in evidence.

The alleged agreement on which suit is brought recites the consideration for Mr. Dibble's promise, and his promise itself, in this way:

"Whereas, the Toledo & Milwaukee Railway Company, a corporation duly created and existing under the laws of the State of Michigan, propose to establish and construct a line of railway from Toledo, in the state of Ohio, through Marshall, Michigan; and whereas, said company propose to establish and construct the general repair-shops of said road at the city of Marshall; now, therefore, I hereby request said railway company to build said railway, and establish and construct said shops, and in consideration of one dollar to me in hand paid, and the further consideration of the benefits I shall receive from said railway, and for the purpose of encouraging the construction of the same, and for the further consideration of the compliance with my request to build said railway, I hereby agree to pay to said Toledo & Milwaukee Railway Company, or order, the sum of five thousand dollars; one-half of said sum to be due and payable when said company shall construct or secure a continuous line of railway of the standard gauge from Toledo to Marshall, or within thirty days thereafter, and the other half of said sum to be due and payable when said company shall establish and construct the general repair-shops of said road at said city of Marshall, or within thirty days thereafter: *Provided*, however, that said road shall be in operation from Toledo to Marshall by the first day of December, 1883, and that said shops shall be constructed within one year thereafter."

In case the shops were removed within 10 years, $2,500 was to be refunded.

The first train ran from Toledo to Marshall on one of the latter days of November. But the company never built any road beyond Dundee, and the whole distance from Dundee to Toledo, more than half of which was in Michigan, was

run over the Toledo & Ann Arbor road, under an arrangement made on the twenty-third of the same month of November, 1883. This was not a lease of the section from Dundee southward, but was a permission to use the track and appurtenances in common with the Ann Arbor road, at a rate of $800 a month for the first year, and $1,000 a month thereafter, and a fair share of the cost of maintenance. The road was to continue in the possession and control of its owners, and all persons employed by either road were to be under the direction of and subject to suspension or dismissal by the Ann Arbor Company. The privilege was subject to termination on 30 days' notice, upon any default. After five years, the Ann Arbor Company could terminate it, and after 18 months the licensee could do so. All local business between Dundee and Toledo was to belong to the Ann Arbor Company.

We do not think this was such an arrangement as was contemplated by Dibble. While it was not necessary that the railway company should literally build the road to Toledo, it was evidently expected that it should have a road under its own control covering the entire distance, and having its repair-shops at Marshall for the whole road. The improvement was contemplated as a permanent one. Provision was made for a return of half the money when the repair-shops should be moved, but none was made for the more serious risk of a stoppage of the road itself short of Toledo. The loss of the work on the Toledo end of the road up to Dundee would make some difference in the amount of repairs to be provided for, and the amount of business tributary to Marshall might be very much less where the company owning the Toledo end of the road could have precedence for its own trains, as well as access to much of the same country. The language of the contract is too definite to be satisfied with access to Toledo over some other company's road, and it must be read as the parties made it.

In the view of the circuit court, no performance was shown, and we think that view correct. The judgment must be affirmed, and certified down; defendant to recover costs throughout.

The other Justices concurred.