WARREN F. STERLING, RECEIVER, *v.* VICTOR CUSHWA & SONS, INC.
SAME *v.* SUSAN F. CUSHWA.
SAME *v.* JANE WILSON BYRON.
SAME *v.* JOHN E. STONEBRAKER.
[Nos. 45, 46, 47, 48, January Term, 1936.]

*Decided February 20th, 1936.*

The causes were argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Albert A. Doub* and *Omer T. Kaylor,* for the appellant.

*Robert H. McCauley* and *Charles F. Wagaman,* with

whom were *Levin Stonebraker* and *John Wagaman* on the brief, for the appellees.

URNER, J., delivered the opinion of the Court.

The declaration in each of these four cases, which were argued together, alleges that the defendant signed and sealed an agreement in the following form:

"Whereas, it is deemed necessary that the sum of Seven Hundred Fifty Thousand ($750,000.00) Dollars must be made available as a Guaranty Fund for The Hagerstown Bank and Trust Company under the terms and conditions hereinafter set forth, and to take the place of and in substitution for the Guaranty Fund heretofore raised.

"(1) The undersigned, each in consideration of the agreement of the others, do hereby subscribe to The Hagerstown Bank and Trust Company Guaranty Fund in the amounts set opposite their respective names and agree to pay or secure to be paid, such subscriptions to The Hagerstown Bank and Trust Company not later than the 10th day of June, 1932. The payments of such subscriptions, as shall not be paid in cash, shall be evidenced by promissory notes secured to the satisfaction of the Committee hereinafter named and payable upon the demand of The Hagerstown Bank and Trust Company.

"(2) Said Subscriptions shall be repaid within a time or times fixed by the Committee hereinafter named, in cash and/or in shares of stock of a corporation now existing or to be hereafter formed; such shares of stock to have such par value and to be accepted by the subscribers at such value as shall be determined as well as all other matters by said Committee, except that each subscriber at the time or times so fixed by said Committee shall have and exercise the option of receiving cash or such shares of stock for his or her subscription. The stockholders of The Hagerstown Bank and Trust Company shall have the right to subscribe to such new stock in proportion to their holdings, on a date to be hereafter fixed on the same basis as such stock not taken by said stockholders shall be received by the undersigned.

"(3) Until the repayment of said subscriptions as aforesaid, said subscriptions shall constitute a guaranty fund for the protection of the depositors and creditors of The Hagerstown Bank and Trust Company and to prevent an impairment of the capital of said institution, and shall rank prior to the stockholders and shall be subordinate to all other creditors and depositors of The Hagerstown Bank and Trust Company.

"(4) The obligations of the undersigned shall be several and not joint and no one shall be liable for the obligations of any other.

"(5) This agreement shall not be binding unless (a) The aggregate of such subscriptions shall not be less than Seven Hundred Fifty Thousand ($750,000.00) Dollars.

"(6) Any subscriber hereto, who shall have subscribed to the other Subscription Agreement to The Hagerstown Bank and Trust Company Guaranty Fund in the Fall of 1931, shall, when this Agreement becomes binding as herein provided, and to the amount of his subscription hereto be released from the obligation of his subscription to said other agreement.

"(7) The Committee shall consist of Thomas W. Pangborn—M. P. Moller—J. Frank Ridenour—Harry E. Bester—Wm. P. Lane, Jr., and a majority of said Committee is authorized to exercise all the powers of said Committee, and its powers may be exercised without a meeting by writing signed by a majority of such Committee. The Committee shall have full authority to determine all matters relating to the subject matter of this Agreement and its powers, except as herein otherwise specifically set forth, shall be as extensive as if said Committee were sole subscriber in the aggregate of such subscriptions and shall no liability, however, except for the exercise of individual good faith. In the event of any vacancy in said Committee, occurring by death, resignation, disability or refusal to act, the remaining surviving members of the Committee shall promptly call a meeting of all subscribers to be duly warned by five days' written notice and at such

meeting, a majority in amount of the subscribers, present in person, or by proxy, shall select a successor to fill said vacancy.

"This Agreement may be signed in any number of counterparts, all of which will constitute one agreement. May 26th, 1932."

Each of the declarations included averments to the following effect:

That the Hagerstown Bank and Trust Company was the largest banking institution in Washington County, with more than eight thousand depositors, and conducted its banking business for many years continuously until February 25th, 1933, when it was closed together with all other state banks by reason of the "Bank Holiday," and was not allowed to reopen after the expiration of that period.

That for a long time prior to May 26th, 1932, many of the banks in Washington County and other parts of Maryland, including the Hagerstown Bank & Trust Company, by reason of the general depression then existing, suffered great depreciation in the market value of their securities, and just prior to that time several large banking institutions in Maryland were forced to close because of depreciation in the value of their assets and the general fear and loss of confidence on the part of their depositors, and for these reasons the state bank commissioner, and the directors and stockholders of the Hagerstown Bank & Trust Company, as well as the subscribers to the agreement quoted in the declaration, were in dread of a "run" on the bank, which might have resulted in its being involuntarily and permanently closed, to the great loss of the depositors, creditors, and stockholders, and of the people of Washington County generally, including all the subscribers to the agreement referred to, and were further in fear that such closing of the bank would bring ruin to other banks in Washington County, destroy the credit agencies, depreciate further the value of securities and other property, and cause the closing of factories, mills, and other agencies in the county for the employ-

ment of labor and capital; and that on or before the date mentioned (May 26th, 1932) the actual market value of the bank's resources had been reduced below the requirements of the law, and for a long time there had been heavy withdrawals of deposits from the bank, causing a depletion of its assets, and there was fear on the part of the bank commissioner and among the directors, stockholders, and many depositors, that the capital of the bank would become impaired.

That during the month of April and the early part of May, 1932, the directors of the bank were advised by the bank commissioner that in order to keep the bank open as a going concern it was necessary that the capital structure be fortified, and that steps be taken to that end without delay.

That in order to restore confidence in the bank and protect its depositors and creditors, and in order to comply with the demands of the bank commissioner and keep the bank open and prevent the impairment of its capital, a committee was designated to secure subscriptions to a fund of not less than $750,000, to be paid into the bank on or before June 10th, 1932, or to be evidenced by promissory notes to be secured to the satisfaction of the committee and payable on demand of the bank, and thereupon numerous persons, including the defendant, executed the agreement, which the declaration proceeded to quote in its entirety.

That the bank and the state bank commissioner, relying upon the agreement so executed by the defendant and others, and depending upon the payment by the subscribers of the amounts of their respective subscriptions, allowed the bank to remain open to receive deposits and to carry on its business in the usual way continuously from May 26th, 1932, until it was closed on February 25th, 1933, by reason of the "Bank Holiday," when the bank was found to be insolvent, and therefore was not allowed to reopen, but was in possession of a conservator for the state bank commissioner from March, 1933, until December, 1934, when the bank commissioner was appointed

receiver of the bank by the Circuit Court for Washington County, with authority to take charge and possession of its books, papers, property, and effects of every kind, and to collect the outstanding debts due to the institution.

That by orders of the Circuit Court for Washington County, the receiver was authorized to bring suit upon any promissory notes or any choses in action which had come into his possession, and was provided with special counsel to advise and represent him in all matters relating to the agreement set forth in the declaration, including the collection of any subscriptions to the guaranty fund to which the agreement referred.

That the bank was allowed to remain open for the usual transaction of business after May 26th, 1932, by virtue of the quoted agreement, and the bank accepted substantial deposits and permitted withdrawals of large amounts in excess of deposits from the date of the agreement until the closing of the bank in February, 1933; that the agreement was primarily intended to secure the depositors and creditors of the bank and constituted a contract between the bank and the subscribers for that purpose; and that in consequence of its execution and in reliance thereon, the bank released each of the subscribers, to the amount of his new subscription, from his obligation under the guaranty fund agreement executed in the fall of 1931.

That the aggregate of the subscriptions under the agreement of May 26th, 1932, signed and delivered to the bank, including that of the defendant, was in excess of $750,000; that almost all the persons who executed the agreement met their obligations thereunder promptly by paying the amounts of their subscriptions in cash or giving their promissory notes properly secured; and that the amount so paid in cash amounted to more than $300,000, and the amount secured by promissory notes also aggregated more than $300,000.

That the Hagerstown Bank & Trust Company is insolvent, and even if the receiver succeeds in the collection of the stock liability of all the owners of capital stock of

the bank and the full amount subscribed in the agreement of May 26th, 1932, the assets in the hands of the receiver will not be sufficient to pay the amounts due to the bank's depositors and other creditors.

That the plan to raise the guaranty fund of $750,000 was approved by the directors of the bank at their meeting on May 24th, 1932, and that the committee named in the subscription agreement, acting for the bank and the subscribers, after its execution, delivered the agreement to the bank and issued a certificate, duly signed by all of the committee, stating that the agreement had been "executed in accordance with the conditions therein by subscriptions in the aggregate exceeding the sum of $750,-000.00, as stipulated in paragraph 5 thereof."

The defendants in the various cases are alleged to be indebted to the receiver for the amounts of their respective subscriptions under the agreement sued on, but to have refused to comply with demands for payment. Two of the suits are for $10,000, and two for $5,000, subscriptions.

Demurrers to the declarations were sustained, and from the resulting adverse judgments, the plaintiff has appealed. It is argued for the appellees in support of the demurrers that the subscription agreement never became binding because the specified sum of $750,000 was not paid in cash or secured by promissory notes, and that the agreement was not sufficiently definite in its terms to be enforceable.

The purpose of the agreement was to make available to the Hagerstown Bank & Trust Company a "guaranty fund" of $750,000. To that end the subscribers agreed to pay or secure to be paid, not later than June 10th, 1932, the amounts set opposite their respective names. The sealed agreement by which they entered into that covenant was dated May 26th, 1932. Their obligations as subscribers originated when the agreement was signed for subscriptions to the total amount required. It is conceded, for the purposes of the demurrer, that the committee named in the agreement, and invested with

comprehensive authority, certified that the agreement had been signed in accordance with the conditions of the paragraph which provided that it should not be binding unless the subscriptions should equal at least $750,000 in the aggregate. That condition having been fulfilled, the agreement became binding according to its terms. It then effectively imposed upon the contracting parties the duty to pay their subscriptions, or secure them by promissory notes, on or before the date specified. The settlements for the subscriptions were thus to be made in pursuance of a conditional agreement which had become definitely obligatory. While the term "subscriptions" is used in some of the other paragraphs of the agreement to indicate the amounts of cash or notes received by the bank from the subscribers, it was accurately and appropriately used in paragraph (1) to describe the obligations thereby created for later performance. It is certain that the contractual undertaking of the defendants and other subscribers was sufficiently complete and effective to accomplish the purpose of enabling the bank to continue its operations. The subscription agreement, when signed for the prescribed total amount, was accepted by the bank, and treated by the committee and the bank commissioner as an adequate and a dependable support for the bank's financial position. Upon the faith of the covenant in which the defendants joined, the bank was allowed to remain open for business and was thus afforded an opportunity to receive new deposits and permit withdrawals from its funds. Most of the subscribers demonstrated their confidence in the effectiveness of the agreement by acting in pursuance of its requirements to the extent of providing $600,000 in cash and securities. In thus performing the agreement on their part they presumably relied upon its corresponding performance by all of the co-subscribers. It was evidently not contemplated that the subscriptions would all be simultaneously satisfied with cash or notes, or that subscribers should delay compliance until the last moment of June 10th in order to be sure that none of them would default.

The failure of the defendants to comply with the terms of their pledges did not relieve them of that duty. A breach of contract is not equivalent to a release from its obligations. Certainly the defendants could not be permitted to rely upon their own default as a ground of exemption from their covenanted liability, nor could they successfully claim exoneration because their subscriptions were not promptly enforced. Their financial responsibility may have been such as to justify a reasonable belief that their signed pledges afforded the same assurance of payment as the secured promissory notes with which their subscription liabilities might have been discharged. At all events, their duly executed agreement was accepted as an available asset of the bank in furtherance of the purpose to which the defendants and their co-obligors were committed.

In our opinion the agreement is sufficiently definite to be enforceable. It provides for the creation of a "guaranty fund" of $750,000 to be made available to the Hagerstown Bank & Trust Company by a method which is distinctly prescribed. The fund was designed to be "for the protection of the depositors and creditors" of the Bank, and "to prevent an impairment" of its capital. The right of the subscribers to the repayment of the fund was to "rank prior to the stockholders," and was to be "subordinate to all other creditors and depositors" of the institution. It was left to the judgment of the amply authorized committee named in the agreement to determine when the amounts of the subscriptions to the fund should be repaid, either in cash or in corporate stock, at each subscriber's option. While the term "guaranty" is used as generally descriptive of the fund to be made available to the bank, the purposes to be served by the fund are specified; and the liability of the subscribers to contribute to it became absolute when the requisite amount was pledged. The repayment of the subscriptions was manifestly contingent upon the hoped for future success which the subscribers were giving the bank an opportunity to achieve. Meanwhile their interests were being

represented and protected by a committee having "full authority to determine all matters relating to the subject" of their agreement.

There were substantial considerations for the liabilities which the defendants agreed to assume. Not only was every subscription expressly made in consideration of the agreement of other subscribers, who have fulfilled their pledges, but a prior subscription agreement was to be, and was, in fact, released to the specified extent, when the new one became binding, and the consent of the bank commissioner to the continued functioning of the bank was thereby induced. The sufficiency of such considerations cannot be doubted. *Gittings v. Mayhew,* 6 Md. 113; *Hughes v. Antietam Mfg. Co.,* 34 Md. 316; *Erdman v. Trustees of Eutaw M. P. Church,* 129 Md. 595, 99 A. 793; 38 *A.L.R.* 881, 906, annotation.

No point is made in the brief for the appellees as to the right of the plaintiff, as receiver of the Hagerstown Bank & Trust Company, to bring this suit, if the declarations state a good cause of action. The asserted liability was contracted to be discharged directly to the bank, for the protection of its capital and the benefit of its creditors, in pursuance of a plan formally approved by its directors, and the agreement to that end was delivered to the bank and came into the hands of its receiver as one of the assets justly applicable to the payment of its debts. In *Small v. Schaefer,* 24 Md. 143, *Northern Central Ry. Co. v. United Rys. & Elec. Co.,* 105 Md. 345, 66 A. 444, and *Mackenzie v. Schorr,* 151 Md. 1, 133 A. 821, this court applied the principle that one for whose benefit a contract has been made by others may sue for its enforcement. In the last of those cases the principle was stated in support of an action by the receivers of a corporation upon an agreement for its benefit between a third person and owners of its capital stock. The suits in those instances were upon simple contracts. But by chapter 108 of the Acts of 1914 (Code, art. 75, sec. 15), it is provided: "In suits brought upon any instrument or writing under seal executed on and after

June 1, 1914, any person entitled to sue or liable to be sued thereon but for such seal, shall be entitled to sue and liable to be sued notwithstanding such seal." There is consequently no reason to deny the receiver's right to maintain this suit, as we have also concluded that the declaration is not otherwise demurrable.

*Judgment in each of the cases (Nos. 45, 46, 47, 48), reversed, with costs, and cases remanded for further proceedings.*

PARKE, J., filed a dissenting opinion as follows:

The opinion of the court proceeds upon the theory that the specialty at bar became enforceable against any of its several subscribers when the aggregate sum of the subscriptions of the several subscribers amounted to $750,000, without reference to the total that had been deposited in money and notes with the bank before the specified day. It is submitted that there was error in so construing the contract, and that the error was founded in a failure to recognize that a right of action in the bank against a subscriber depended upon the existence not only (1) of a total subscription of not less than $750,000, but also (2) of the payment or deposit in funds, (3) by a given day, either of that amount or of that amount less the particular subscription of the severally bound subscriber, who had not performed his primary contractual promise to pay. In other words, the cause of action must exist at the time suit is brought. To sustain the action there must be not only the breach of the primary contractual obligation to pay, which gave rise to the obligor's secondary duty to pay damages in the amount of the covenant to pay, but, in addition, it is indispensable that the secondary duty continue to exist. If there be operative facts contemporaneous with the origin of the secondary duty, or subsequently occurring, whose nonexistence is a condition precedent to the plaintiff's right to a judgment, although not precedent to plaintiff's right to payment as covenanted, the action

will not prevail. It will be found that the allegations of the declaration aver the operative facts which established an affirmative defense. *Infra.*

With these preliminary principles in mind, the terms of the contract must be interpreted and construed in connection with all the circumstances set forth in the declaration. The bank was in a gravely embarrassed financial position. It had been notified by the bank commissioner that it would be closed by a fixed date, unless by that time a sufficient fund would be procured and made available as a guaranty of the depositors and creditors of the bank. No peril could be greater nor more imminent. Not only must an amount be subscribed which would be sufficient to restore the liquidity and capital assets of the bank, but the whole amount subscribed must be raised and actually be delivered in hand to the bank by the prescribed date, because a less amount would be inadequate and a deferred delivery would be too late to avert the impending disaster. So, the fundamental requisites of a remedial contract were the *amount* to be subscribed; the *delivery* to the bank by subscribers of the amount severally agreed by payment on or before the *time* specified, in money or in promissory notes, which had been secured to the satisfaction of the committee whose members had solicited the subscriptions and who were representatives of the subscribers in certain of the details of the transaction.

The *amount* and its *delivery* within the *time* designated were the three conditions precedent whose fulfillment were indispensably necessary to the creation of the contemplated guaranty fund in accordance with the contract of the subscribers. From May 26th, 1932, the date of the subscription, until June 10th, 1932, the bank was made the depositary of the money and the approved promissory notes which the contract provided should be individually delivered to the bank by the subscribers. June 10th, 1932, was the last day on which deposits could be made and the conditions precedent be performed, because the contract so specified, and time is of the essence

of this mercantile contract. *Gill & McMahon v. Weller,* 52 Md. 8, 14; *Gilman v. Smith,* 71 Md. 171, 173, 17 A. 1035; *Bohn Mfg. Co. v. Lewis,* 45 Minn. 164, 47 N.W. 652 The fulfillment of these conditions precedent was necessary before the plan of relief became effective so as to make the money and notes deposited available as the specified guaranty fund.

It is submitted that this intention is clearly expressed by the paper writing which was signed by the parties, and is in complete harmony with the design of its signers and the circumstances of its execution. The introductory recital prevents a doubt. It declares that the subscribers deem it "necessary" that the "sum" of $750,000 "must" be made "available" as a "Guaranty Fund" upon the "terms and conditions" of the body of the contract of subscription and for the purpose of substituting it for an existing guaranty fund. Nor is this dominant intention inconsistent with the later clause that: "This agreement shall not be binding" unless the aggregate of such subscriptions shall be not less than $750,000. This clause must relate to an aggregate of $750,000 either in the *promises* to pay or in the *performance* of the promises to pay. If the first alternative be true, it is limited to the *promises,* and, so, would not exclude other conditions which relate to the *performance.* If, however, the clause has reference to *performance,* it would necessarily embrace the promise from which the performance flowed. Therefore, in either construction, the conditions precedent would be unaffected. However, performance was of the substance, and it should be noted that the word "subscriptions" is employed in the document in the twofold sense of denoting the *promise* to pay, which is the more common usage, and the *performance* of the promise, that is the delivery of money and approved notes in payment of the amount subscribed. *Thames Tunnel Co. v. Sheldon,* 6 Barn. & Cres. 341, 347, 348.

It is with this second meaning that the term is used in paragraphs preceding the clause under consideration. For instance, in the phrase, "Until the repayment of said

subscriptions as aforesaid, said subscriptions shall constitute a guaranty *fund* for the protection of the depositors and creditors," the term "subscriptions" indisputably signifies the money and notes delivered that together constituted the fund whose existence depended on *performance*. By reading the term as meaning a *fund* raised through sums of money subscribed by a number of persons, a construction is given which is sensible and consistent with the objects and provisions of the contract. So, no matter how viewed, the clause in question does not limit the conditions precedent to the one whose performance was the procurement of *promises* to pay in the aggregate amount of $750,000.

The money and notes deposited on or before June 10th were provisionally in the custody of the bank, which so held them until that date or the earlier fulfillment of the other conditions of delivery and amount. If, on or before the day named, all the conditions precedent were met, and there had been deposited with the bank the money and accepted notes in the aggregate sum of $750,000, the contemplated guaranty fund would have been created; the bank would have ceased to serve as depositary, and would have become a trustee to hold and use the money and notes so deposited as a dedicated "guaranty fund for the protection of the depositors and creditors of the Hagerstown Bank and Trust Company and to prevent an impairment of the capital of said institution." *Perry on Trusts,* secs. 242-245; *McKee v. Lamon,* 159 U. S. 317, 322, 16 S.Ct. 11, 40 L.Ed. 165; *Rogers Locomotive & Machine Works v. Kelley,* 88 N.Y. 234, 235; *Nash v. Commonwealth,* 174 Mass. 335, 54 N.E. 865. Subject to these uses, the rights of the subscribers were made superior to the stockholders; and the subscribers were ultimately to be repaid, within the period fixed by the committee, their respective subscriptions, at their option, either wholly or partly in money "or in the shares of stock of a corporation now existing or to be hereafter formed."

If, however, the conditions precedent were not fulfilled

by the day prescribed, the trust did not arise; the bank acquired no title to the fund deposited, and had the duty of returning to every one of the subscribers the money or notes which had been deposited with the bank. *Addison on Contracts,* vol. 3, sec. 1345; *Halsbury's Laws of England* (2nd Ed.) vol. 7, title Contract, sec. 396, p. 287; *Machen on Corporations,* vol. 1, sec. 415; *Nockels v. Crosby,* 3 Barn. & Cres., 814; *Moore v. Garwood,* 4 Exch. 681; *Walstab v. Spotteswoode,* 15 Mees. & Wels., 501; *Mowatt v. Londesborough,* 4 El. & Bl. 1; *Johnson v. Goslett,* 3 C.B.(N.S.) 569; *Ward v. Londesborough,* 12 C.B. 252; *Ashpitel v. Sercombe,* 5 Exch. 147; *Kremen v. Rubin,* 139 Md. 682, 690, 116 A. 640; *Carter v. Carter,* 14 Pick.(Mass.) 424; *Hudson v. West,* 189 Pa. 491, 42 A. 190; *Fitzwilliam v. Travis,* 65 Ill. App. 183; *Bradford v. Harris,* 77 Md. 153, 26 A. 186; *Capper's Case,* 1 Sim. (N. S.) 178; *Aldham v. Brown,* 7 El. & Bl. 164, 2 E. & E. 398; *Bither v. Packard,* 115 Me. 306, 98 A. 929, 932.

The primary obligation of the subscriber A was to pay his subscription. He would have discharged this obligation by making his payment to the bank as a depositary at any time from May 26th, provided it were not later than June 10th. Until the expiration of this last day the subscriber was not in default. If, on the day mentioned, the subscriber had not paid and did not then pay, he committed a breach of his primary obligation, but his secondary remedial obligation to pay the amount of his subscription in an action of debt on his several covenant depended upon the act or performance of the other several subscribers, because if the aggregate of the money and approved notes which had been deposited with the bank on or before June 10th would, with the payment of the defaulting subscriber A's subscription, have totaled or exceeded the sum of $750,000, all the conditions precedent of amount of the subscriptions, and the payment of all the amounts subscribed by the time named, would have been fulfilled; and for his failure to perform, the defaulting subscriber would have been liable in an action of debt on his covenant to pay, since

it was his breach which had occasioned the failure of the conditions precedent to be performed. See *Scarlett v. Academy of Music,* 46 Md. 132, 153. If, on the other hand, the aggregate of money and notes deposited on or before June 10th, together with the amount of the subscription which the defaulting subscriber and defendant A had failed to deposit, was not equal to as much as $750,000, the two conditions precedent of the payment of the fund subscribed by the time named were not met, and the failure of the conditions precedent was not due to the breach of the defaulting subscriber nor to be remedied by an action against the particular defaulter by suit, since the failure of the conditions prescribed would still independently subsist and the subscriber would not be bound because of the refusal of other several subscribers to perform as had been severally agreed. In the first assumed combination of facts, the default of the subscriber A would be the breach which would cause the fund paid in by the date specified to fail to meet the conditions precedent necessary for the contract to become operative in the creation of a trust for the uses intended. In the second assumed combination of facts, the conditions precedent would not be fulfilled and the trust would therefore not arise, whether or not the subscriber A had fully performed his primary obligation, because of the distinct default of one or more other subscribers in his or their performance of the primary several obligations to pay as agreed. The subscriber A, as well as all the other subscribers, was not jointly nor jointly and severally bound, but severally bound, so, in the absence of a wrongful conspiracy or confederation of subscriber A in the default of the other subscribers, A would not be affected by the several defaults which had resulted without any participation on A's part. *Anson on Contracts* (Am. Ed. Corbin) secs. 334, 335; *Williston on Contracts* (2nd Ed.) sec. 323. For the same reason, if either waiver or estoppel should prevent another, or all other, subscribers from relying on a discharge from the contract because of a nonperformance of conditions

precedent, the subscriber A would not be affected by such waiver or estoppel, unless he was included therein by reason of his participation in or authorization of the facts which constituted the waiver or estoppel. The terms of the contract are specific that the obligations of every subscriber "shall be several and not joint and no one shall be liable for the obligations of any other." *Mechem on Agency* (2nd Ed.) vol. 1, sec. 725. The independent breach of one subscriber in a several contract is not imputed to any other subscriber. *Little v. Edwards,* 69 Md. 499, 508, 509, 16 A. 134; *United States v. Knox,* 102 U.S. 422, 26 L.Ed. 216; *Coyle v. Taunton etc. Co.,* 216 Mass. 156, 103 N.E. 288. So, the nonperformance by other several subscribers to the contract of that which was a condition precedent to the existence of the secondary obligation, and to the remedy against the subscriber A, effected a discharge of the subscriber A from his primary obligation to pay his subscription. There are many analogous illustrations of conditions precedent whose nonperformance operated to discharge the promisor from his promise. *Dalrymple v. Lauman,* 23 Md. 376, 398-402; *Webb v. Baltimore & Eastern Shore R. Co.,* 77 Md. 92, 26 A. 113; *Taggart v. Western Md. R. Co.,* 24 Md. 563; *Baltimore & Drum Point R. Co. v. Pumphrey,* 74 Md. 86, 21 A. 559; *Portage Co. v. Wisconsin etc. R. Co.,* 121 Mass. 460; *Central Turnpike Corporation v. Valentine,* 10 Pick. (Mass.) 142; *Hughes v. Antietam Mfg. Co.,* 34 Md. 316, 332; *Fiery v. Emmert,* 36 Md. 464, 474; *Hager v. Cleveland,* 36 Md. 476, 490, 491; *Garling v. Baechtel,* 41 Md. 305, 322; *Musgrave v. Morrison,* 54 Md. 161, 164; *Gettysburg etc. Bank v. Brown,* 95 Md. 367, 385, 386, 52 A. 975; *Morgan v. Landstreet,* 109 Md. 558, 588, 72 A. 399; *Webb v. Moeller,* 87 Conn. 138, 87 A. 277; *Sherrod v. Duffy,* 160 Mich. 488, 125 N.W. 366; *Brown v. Dibble's Estate,* 65 Mich. 520, 32 N.W. 656; *People's Ferry Co. v. Balch,* 8 Gray (Mass.) 303; *State Bank of Indiana v. Cook,* 125 Iowa, 111, 100 N.W. 72.

In the case at bar the impossibility of performance of

the conditions precedent to the defendant's secondary or remedial obligation to pay a subscription of $10,000 in the instant case is shown by the allegations of the plaintiffs that "almost all the persons who executed said Subscription Agreement met their obligations thereunder promptly and paid the amount of their said subscriptions in cash or evidenced the same by their promissory notes properly secured as provided in said Guaranty Fund Contract; and that the amounts so promptly paid thereon in cash amount to over $300,000, and the amounts evidenced and secured as aforesaid by promissory notes on account of their subscriptions amounted in the aggregate to over $300,000."

Disregarding the fact that it does not appear that the money and notes were deposited on or before June 10th, the aggregate of these deposits was $600,000, which, with the subscription of the defendants of $10,000, was far from the $750,000 which the contract exacted should be in the hands of the depositary on or before June 10th. Under such circumstances it would have been a futile gesture for the defendants to have paid or deposited $10,000 in money or notes by the day set, since the depositary would have been bound to have refunded the deposit, because the requisite amount of $750,000 had not been raised. *Supra.* Here the accrued rights of action for a breach of the defendant's primary obligation is discharged by the subsequent inability of the bank to perform. The principle is thus stated by Williston: "It may seem that where performance on one side of a contract is precedent to that on the other, and the time for the prior performance has arrived, and no defense then existing, a right of action has arisen, this right of action cannot afterwards be destroyed except by payment, or release, or accord and satisfaction. Such, however, is not the case. Circumstances may arise subsequently which would justify the recovery back of the prior performance, if it had been given, and, therefore, if it had not been given but a cause of action for it arisen, to avoid circuity of action the court will deny recovery." *Williston on Contracts,* secs. 884, 885; *Machen*

on *Corporations,* sec. 415; *Bradford v. Harris,* 77 Md. 153, 158-161, 26 A. 186. See *Corbin, Conditions in the Law of Contract* (1918) 28 Yale Law Journal, 739; *Selected Readings on Law of Contracts,* p. 871.

For these reasons, which apply equally to Nos. 46, 47, and 48, I am of the opinion that the demurrers were rightly sustained and the judgments should have been affirmed.