LAWRENCE H. ROBERTS ET UX. *v.* HOWARD L. GATES ET UX.

\* \* \*

HOWARD L. GATES ET UX. *v.* BALTIMORE COUNTY, MARYLAND ET AL.

[No. 391, September Term, 1974.]

*Decided January 20, 1975.*

The cause was argued before MOYLAN, POWERS and LOWE, JJ.

*Charles W. Held, Jr.,* and *Rolf A. Quisgard* for appellants

Lawrence H. Roberts et ux. *Richard N. Kerr* and *Charles E. Norton, Jr.*, for appellants Howard L. Gates et ux.

*Thomas J. Aversa, Jr., Assistant County Solicitor*, with whom were *R. Bruce Alderman, County Solicitor* and *Harry S. Shapiro, Assistant County Solicitor*, on the brief, for appellee Baltimore County. *Richard N. Kerr* and *Charles E. Norton, Jr.*, for appellees Howard L. Gates et ux.

LOWE, J., delivered the opinion of the Court.

As a condition precedent to requiring final approval of proposed subdivisions, Baltimore County may require the execution of a public works agreement for the improvement of any one or all of the numerous public services and ways including roads and sewers. Balto. Co. Code, Art. IV, § 22-34. In 1958 Lawrence H. Roberts (Roberts) proposed to develop Section I of Sherwood Hills. On December 9, 1958 he executed Public Works Agreement No. 85814. Pursuant to its practice Baltimore County (County) provided him with an estimate of the cost of construction in the sum of $7,450.00. Roberts' development plans did not progress beyond that point.

On October 24, 1964 Roberts and his wife contracted to convey a portion of Section I to Howard L. Gates and his wife (Gates) which was done by deed November 25, 1964. Six months later an additional portion was conveyed to Gates and Vickers (still collectively referred to as Gates), constituting a little more than half of Section I. Each of the contracts contained a provision insuring that the properties were free and clear of all encumbrances, "including all past and future public works costs, which shall be the responsibility of the sellers." Mr. Gates then purchased another property in Sherwood Hills from Roberts, which had not yet been subdivided. This property is designated Section II.

In March of 1967 the County revised its cost estimate for the agreed sewer and road improvements in Section I, raising the amount to $10,675.00. Upon request by the County, Roberts promptly deposited that sum.

In order to proceed with the development of Section II Gates entered into a Public Works Agreement with the County applicable to that parcel. The County, however, saw this as an opportunity to procure the improvements not yet commenced under the Roberts' Agreement (No. 85814) for Section I, the cost of which had apparently nearly tripled since the revised County estimate deposited by Roberts in March of 1967. Realizing that Gates owned six of the eleven lots constituting Section I, County included in his Section II agreement (No. 86702) a condition precedent that the contracts for the improvements under the Roberts' agreement (No. 85814) actually be awarded. Paragraph No. 34 typed into the form agreement provided:

"Public improvements covered by this agreement cannot be put under contract, and Building Applications will not be released prior to award of contracts covered by Public Works Agreement #85814 (Sherwood Hills, Sec. 1)."

This was followed by a more detailed agreement between County and Gates dated September 23, 1968. It recited the ownership history and pointed out that Section II was only accessible from existing public ways by the proposed improvements through Section I contemplated by the Roberts' agreement (No. 85814). After describing the consideration as Gates' desire to proceed with the development of Section II and County's approval thereof, the agreement set forth the following conditions:

1. It required that Gates post bond in cash or by lien on Section II in the amount of $15,000 to guarantee part of the improvements. (Powers Avenue of Roberts' agreement No. 85814). Partial releases were to be available at $1,000 per lot.

2. County was to sue Roberts to specifically enforce his agreement No. 85814.

3. Gates was to post an additional sum, later determined to be $3,279.54, to guarantee other

improvements under Roberts' No. 85814 agreement (Osage Road).

4. Paragraph 4 covered alternatives contingent upon the result of the suit against Roberts. If County lost to Roberts they agreed that unless County sued Gates within 6 months, all monies would be returned and liens released.

5. Gates was to post bond to cover his own public works agreement with County for Section II, No. 86702.

6. County agreed "that the terms of this Agreement in no way are to be construed as acceptance by [Gates] of any responsibility whatsoever of the Public Works Agreement DPW 85814 in whole or in part."

7. County then agreed to solicit bids for the Section II public improvements.

On November 21, 1968 County sued Roberts in the Circuit Court for Baltimore County, Equity No. 64194, Docket 86, Folio 416, in accordance with the second condition, *supra*. Roberts prevailed over County in that suit.* Although the decree dated April 30, 1973 directed Roberts to convey "the road bed of Osage Road to Baltimore County, Maryland, as required by Public Works Agreement 85814 submitted to this Court" it concluded by stating:

"but in all other respects, the relief prayed for in the Bill of Complaint is hereby denied."

The following day, May 1, 1973, a Bill of Complaint was filed against Gates praying the identical relief denied against Roberts, No. 76052, Docket 98, Folio 420. Gates answered and filed a counterclaim against County asking return of all monies paid by Gates to County for public

---

* Perhaps because we were privy only to the opinion of the chancellor in the Balto. Co. v. Roberts case and did not review the entire record, we were unable to understand how Judge Raine concluded that Roberts did not fall under the appropriate definition of developer as set forth in the Baltimore County Code. That case was not appealed, however, and the issue is not before us.

works improvements in Section I. Gates also filed a third party claim against Roberts based upon the provision in the purchase contract from Roberts insuring all "past and future public works costs," in effect asserting that if he were liable to County, Roberts was liable to him.

The total cost of improvements to Section I pursuant to the Roberts' agreement had risen to $35,415.00. As assurance of payment, Roberts had deposited $10,675.00 and Gates $11,279.54 by cash or liens. A balance of $13,460.46 was due. These figures are not disputed in this appeal.

The issue was considered by the chancellor on Motion for Summary Judgment which he granted May 22, 1974. Ironically this Specific Performance [1] suit culminated in "monetary decree[s]," one in the amount of $13,460.46 [2] against Gates to the benefit of County, and one in the sum of $24,740.00 against Roberts to the benefit of Gates, being the difference between the current total cost of $35,415.00 and the $10,675.00 previously deposited by Roberts with County.

While Roberts ardently presses his appeal, Gates is less enthusiastic since neither side of the coin resulted in injury to him. He has appealed nonetheless.

The chancellor's opinion turned on Paragraph 33 as contained in both the Roberts and Gates Public Works Agreements. It reads:

" ... this Public Works Agreement shall be considered to be legally executed and binding upon the parties hereto, their successors, personal representatives, heirs and assigns."

The chancellor found Gates responsible under that clause in agreement No. 85814 as assignee of six of the eleven lots in Section I concluding that Gates "had notice of the binding effect of such agreement on an assignee, because his own

1. Neither the availability nor adequacy of either remedy was raised below or on appeal.
2. The sum against Gates represents the balance County has not received from the total cost of $35,415.00. County received from Gates $11,279.54 and from Roberts $10,675.00 equalling $21,954.54. The chancellor awarded County $13,460.46 from Gates but returned to him that plus the amount paid out pursuant to his "special agreement."

Public Works Agreement [No. 86702] contained an identical provision." The chancellor then went on to say that Gates could take no comfort from the result of the suit by the County against Roberts because Gates had not intervened in that suit. Therefore, he said,

"That case would not be *res judicata* as far as Gates was concerned because he was not a party to it. Nor would it constitute equitable estoppel. There is nothing in Judge Raine's opinion which would in any way affect any developer of Section 1 other than Roberts. Judge Raine said Roberts elected not to go forward with the development. However, anyone else who proceeded with the development would have to pay for the cost of the public works improvements."

In a "Supplemental Opinion" the chancellor responded to a collateral estoppel argument on Motion for Judgment N.O.V. by finding the issues determined in the earlier case against Roberts different from those determined by him in the suit against Gates:

"The issues presented, and decided by me, in the present case were: (1) What obligation ran from Gates to Baltimore County, Maryland, under his Public Works Agreement No. 86702; and (2) What obligation ran from Roberts to Gates by virtue of the contracts of sale (agreed Exhibit No. 2) dated October 24, 1964, and May 17, 1965, respectively? [3]

The mere statement of the issues presented in the two cases demonstrates that they are not "identical", and that, therefore, the doctrine of collateral estoppel does not apply to this case.

---

3. We note, however, that the questions posed by the chancellor in his original opinion differ from those set forth in the "Supplemental Opinion." As phrased in the original opinion the chancellor set out to answer his own question "Is the County entitled to specific performance of the Public Works Agreement of Gates?" If he was as later stated, referring to No. 86702 as it affected Section II, no where does he meet that issue nor does the Bill of Complaint pray such relief. Both original and supplemental opinions deal solely with the conditions and responsibilities of improvements of Section I under Agreement No. 85814.

> Clearly, res judicata does not apply for the parties in the two cases were not the same."

We find ourselves in disagreement with the chancellor both as to reasoning and result.

The doctrine of *res judicata* is that a prior judgment between the same parties and *their privies* is a final bar to any other suit by or against any of them upon the same cause of action. It is conclusive, not only as to all matters that have been decided on the original suit, but as to all matters which with propriety could have been litigated in the first suit.

From the web of detail woven around the instant case a single, determinative — and quite simple — fact emerges: that Gates was in privity with Roberts. Either of two decisions by the chancellor supports that conclusion. When he held Gates liable for Agreement No. 85814 by virtue of Roberts' paragraph 33 undertaking to bind his successors, he impliedly found that Gates was a privy of Roberts.[4] When the chancellor, in turn, required that Roberts reimburse Gates for his payments to County, by virtue of Roberts' contractual obligation to insure Gates against liability on Agreement No. 85814, he impliedly found Roberts in privity with Gates. In short, Gates was liable for Roberts' obligation, and Roberts was liable for any obligation imposed on Gates under Agreement No. 85814.

As a third party defendant, Roberts was entitled to raise any defense assertable by Gates, which he did, *viz: res judicata*. Since the prior trial involved the same "parties or privies" and the same cause of action, we think it inescapable that the County was forever barred from

---

4. We recognize that the provision purporting to bind successors is at best a tenuous basis for a finding of privity. There is nothing in the Baltimore County Code nor any other law to our knowledge, which could contractually encumber a successor in interest to perform an act which the successor had no where agreed to perform, unless the agreement were in the nature of a covenant running with the land. We find more difficulty spanning that legal chasm than did the chancellor; however, our decision obviates in-depth consideration of this issue.

subsequently relitigating its claim whether against Gates or Roberts.[4A] As the Court of Appeals has written:

> "Estoppel by judgment, which is *res judicata*, may be direct or collateral. If the second suit is between the same parties and is upon the same cause of action, a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which were litigated in the earlier case, but as to all matters which could have been litigated." *Sterling v. Local 438, Etc.*, 207 Md. 132, 140.

The chancellor's statement that Gates would have to have intervened in Roberts' suit to enjoy the defense of *res judicata* was erroneous.

We need not concern ourselves with the chancellor's recitation of the court's "opinion" in the original "Roberts" case since it is the *decree* and not the *opinion* of a court that governs, *Hudson Bldg. Supply Co. v. Steelman*, 258 Md. 304, and the decree specifically denied "in all other respects, the relief prayed in the Bill of Complaint" against Roberts. As we have pointed out, the relief prayed in the Gates' case was identical to that previously asked against Roberts.

In contrast, Gates is *directly* obligated under Public Works Agreement No. 86702 which applies to the

---

**4A.** County's contract with Gates provided that it would first sue Roberts to enforce Agreement No. 85814, and only if that suit was unsuccessful sue Gates.

> "2. Baltimore County, Maryland, does hereby agree to file the aforesaid Specific Performance suit against Lawrence H. Roberts within sixty (60) days of the execution of this agreement. In the event that the said suit is not instituted within said sixty days, the aforesaid bond or the elected alternative, shall be released by Baltimore County, Maryland. Baltimore County agrees that Howard L. Gates and Doris Ann Gates will not be a party to said suit unless Lawrence H. Roberts makes Howard L. Gates and/or Doris Ann Gates a party thereto."

County urges that by virtue of this provision Gates impliedly consented to suit and waived any *res judicata* defense. We fail to see how this language could be interpreted as a waiver by Gates of his defense of *res judicata* by removing him from the status of being in privity with Roberts. Obviously, in retrospect, had County exacted such a concession from Gates its troubles would be over. No such provision was included in the contract and we cannot now impose County's unarticulated intention on Gates. *Sachse v. Walger*, 265 Md. 515, 520.

unsubdivided Section II. The inserted condition precedent in paragraph 34,[5] however, in no way obligated him for public improvements to Section I, but rather merely put him on notice that development of Section II would be delayed pending performance of the Roberts' Agreement No. 85814, on Section I. The same condition precedent would have been appropriate to any back land development accessible only by proposed road construction through a separate proposed development. It *committed* Gates to do nothing. His Section I ownership *permitted* him to proceed with the Section I improvements if he so chose but he was compelled to do nothing.

Nor did the separate "Agreement" of September 23, 1968 provide any compulsion to act beyond that which Gates may have had as Roberts' successor. To the contrary, there was included in that Agreement an express denial of responsibility under the Roberts' Agreement:

> "6. Baltimore County, Maryland agrees that the terms of this Agreement in no way are to be construed as acceptance of the Developers [Gates] of any responsibility whatsoever of the Public Works Agreement DPW 85814 in whole or in part."

In conclusion, we hold as was held in *Sterling, supra,* "that the decree in the [first] equity case was conclusive of the [identical] claim asserted" in the second case. The County is estopped by the first decree from proceeding against Roberts or his privy Gates, to the extent of the Public Works Agreement No. DPW 85814.

---

5. Although the County contends in their Bill of Complaint that under paragraph 34 of the Gates' Agreement (No. 86702) Gates "agreed to assume the obligations set forth herein above with respect to Public Works Agreement No. 85814", we fail to see such assumption. The relevant language of paragraph 34 of Agreement No. 86702 reads:

> "Public Improvements covered by this agreement can not be put under contract, and Building Applications will not be released prior to award of contracts covered by Public Works Agreement #85814 (Sherwood Hills, Sec I)."

This is a far cry from assuming the obligations of "Agreement #85814."

The Order and Decree of May 22, 1974 is reversed without remand as to the "monetary decree" against Gates in favor of Baltimore County. It follows that the grant of the Third Party Claim against Roberts in favor of Gates is also reversed without remand.

The Order is reversed and remanded, however, as to the Counter-claim of Gates against the County which was not reached below. The retrial is for the limited purpose of determining what if any relief Gates is entitled to receive against the County.[6]

> *Judgment reversed in part and remanded in part for further determination pursuant to this opinion.*
>
> *Costs to be paid by Baltimore County.*

---

6. The relief prayed in the Counter-claim is:

(a) the release of liens on Section II, and

(b) refund of monies deposited to guarantee public works in Section I.