569 F.2d 87
 186 U.S.App.D.C. 256
 John H. SAFER et al.
v.
Frank M. PERPER et al.
DONOHOE CONSTRUCTION COMPANY, INC., a Maryland Corporation, Appellant,
v.
DWOSKIN, INC., et al., Third-Party Defendants.
John H. SAFER et al., Appellants,
v.
Frank M. PERPER et al.
v.
DWOSKIN, INC., et al., Third-Party Defendants.
 Nos. 75-1576 and 75-1577.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 23, 1976.
Decided Nov. 30, 1977.
As Amended Dec. 8, 1977.
 
 Joseph V. Gartlan, Jr., Washington, D. C., with whom Dorothy Sellers, Washington, D. C., was on the brief, for appellant in No. 75-1576 and Donohoe Const. Co., Inc., appellee in No. 75-1577.
 Thomas S. Jackson, Washington, D. C., for appellants Safer et al. in No. 75-1577 and appellees Safer et al. in No. 75-1576. Patricia D. Gurne, Washington, D. C., also entered an appearance for appellants Safer et al. in No. 75-1577 and appellees Safer et al. in No. 75-1576.
 Richard W. Galiher, Washington, D. C., for appellants Perper et al. in No. 75-1577 and appellees Perper et al. in No. 75-1576.
 Before DANAHER, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 We are called upon to review various rulings of the United States District Court for the District of Columbia in a case concerning the alleged breach of a construction contract for a Holiday Inn motel located in Chevy Chase, Maryland. We are presented with issues concerning the capacity of various entities to recover on the construction contract, the liability of the contractor, and the measure and certainty of damages. Because the capacity issues center upon a byzantine series of transactions, it is necessary to set out the relevant facts in a fairly detailed manner.
 
 I. THE FACTUAL BACKGROUND
 
 2
 In October 1968, the property upon which the motel is located belonged to Somerset Properties Joint Venture (Joint Venture), whose principals were John H. Safer and Stephen A. Winkelman. On October 10, 1968, Joint Venture entered into a lease agreement with Chevy Chase Motel Associates (Chevy Chase), under which Joint Venture agreed to construct and lease a motel and related facilities[1] to Chevy Chase for twenty-one years with two consecutive renewal options of twenty-one years each.
 
 
 3
 By contract dated February 11, 1969, Winkelman and Safer[2] agreed to sell the property to the Winthrop Lawrence Corporation (Winthrop) and Lammot DuPont Copeland, Jr. By deed dated April 11, 1969, Winkelman and Safer granted the property to Winthrop. Winthrop gave back a deed of trust and a note[3] guaranteed by Copeland. Winthrop granted the property to Copeland by deed dated the same day.[4]
 
 
 4
 In April 1969, Donohoe Construction Co., Inc. (Donohoe) began construction of the motel.[5] On May 6, 1969, before any of the deeds of April 11, 1969, had been recorded, Winthrop signed a standard form, stipulated sum AIA construction contract for the motel complex with Donohoe. Once again, Copeland acted as Winthrop's guarantor. The contract price was $3.4 million.
 
 
 5
 On May 7, 1969, the deed from Winkelman and Safer to Winthrop was recorded. On June 30, 1969, the deed from Winthrop to Copeland was recorded. On August 26, 1970, Copeland filed a declaration of trust indicating that the property was being held fifty percent for himself and fifty percent for Thomas Shaheen.
 
 
 6
 Copeland filed for a Chapter 11 bankruptcy arrangement on October 20, 1970, in the United States District Court for the District of Delaware. Winthrop filed similarly on November 10, 1970, in the United States District Court for the District of Maryland.
 
 
 7
 Chevy Chase received occupancy of part of the motel in January 1971, and of the remainder no later than May 1971. On May 5, 1971, Donohoe filed a mechanic's lien against the property, the principal of which was $184,419.46.[6] On the same day, pursuant to a private power of sale in the trust deed given to Winkelman and Safer dated April 11, 1969, the property was sold at foreclosure to Financial Underwriters, Ltd. (Financial).[7] The sale was ratified by the Circuit Court for Montgomery County, Maryland, on June 18, 1971.
 
 
 8
 On July 19, 1971, Financial assigned all of its right, title, and interest in the property to the Somerset Properties Limited Partnership (Limited Partnership).[8] Five days later, on July 24, 1971, Limited Partnership, the trustees, and Financial deeded fee simple title to the Peoples Life Insurance Company (Peoples). Peoples leased the land back to the Limited Partnership for fifty years on August 16, 1971, and gave the Limited Partnership a quitclaim deed to the improvements. Two days later, Limited Partnership paid the lien of Donohoe in the total amount of $205,079.58.[9]
 
 
 9
 Certain damage claims developed in connection with the construction of the motel, most notably with respect to the wall coverings in the halls and rooms, the riser pipes, and water spots on various ceilings. Winkelman and Safer, on behalf of Joint Venture and Limited Partnership, brought suit[10] against Chevy Chase and Donohoe on November 30, 1972, seeking injunctive and declaratory relief with regard to a demand for arbitration by Chevy Chase against Joint Venture under an arbitration clause in the lease of October 10, 1968. In the alternative, the complaint asked that Donohoe be brought into the arbitration proceedings.
 
 
 10
 The complaint was amended to seek damages from Donohoe for breach of the construction contract of May 6, 1969. Chevy Chase cross-claimed against Donohoe for breach of the construction contract, predicating its claim on a third-party beneficiary theory. Chevy Chase, Joint Venture, and Limited Partnership were aligned to oppose Donohoe. It was in this posture that the case proceeded.
 
 
 11
 Donohoe moved for summary judgment, and, in the alternative, for judgment on the pleadings against both plaintiffs and against cross-claimant Chevy Chase. The trial judge granted Donohoe's motion for summary judgment against Chevy Chase and Joint Venture. Memorandum and Order of Sept. 13, 1973, Joint Appendix (J.A.) at 85-89; Memorandum and Order of Oct. 30, 1973, J.A. at 90-95. Both Chevy Chase and Joint Venture appeal, each urging that it was a third-party beneficiary capable of maintaining suit on the construction contract. The trial judge denied Donohoe's motion with respect to Limited Partnership, ruling that Limited Partnership was the "successor-in-interest" of Winthrop. Memorandum and Order of Sept. 13, 1973, J.A. at 85-89; Memorandum and Order of Oct. 30, 1973, J.A. at 90-95. On appeal, Donohoe argues that Limited Partnership has no such status.
 
 
 12
 On the eve of trial, Donohoe renewed its motion for summary judgment against Limited Partnership based upon "newly discovered" facts.[11] The trial judge denied Donohoe's renewed summary judgment motion. Memorandum and Order of Nov. 19, 1974, J.A. at 99-103. Donohoe appeals.
 
 
 13
 The case was tried without a jury. The district court awarded Limited Partnership a total of $68,000: $47,500 in connection with the vinyl wall coverings, $17,000 in connection with the water leak damage, and $3,500 in connection with a missing electrical thermostat and chiller interlock. Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 104-14. Donohoe appeals these damage awards.
 
 
 14
 Limited Partnership was denied an award based on the substitution of stainless
 
 
 15
 steel for copper pipes in the risers, and it appeals. II.
 
 JOINT VENTURE AND CHEVY CHASE AS THIRD-PARTY
 BENEFICIARIES OF THE CONSTRUCTION CONTRACT
 
 16
 Section 7.1.1[12] of the construction contract states that the contract is to be construed in accordance with the law of the place where the building is located,[13] and it is well-established under Maryland law that certain third-party beneficiaries may maintain suit on a contract and that strict privity of contract is not always a prerequisite to enforcing contractual rights. Small v. Schaefer, 24 Md. 143, 158-59 (1866); accord, Sterling v. Cushwa & Sons, 170 Md. 226, 236, 183 A. 593, 597 (1936); MacKenzie v. Schorr, 151 Md. 1, 8, 133 A. 821, 823-24 (1926); Northern Central Railway Co. v. United Railways & Electric Co., 105 Md. 345, 363-64, 66 A. 444, 449-50 (1907). Maryland has adopted the definitions of donee beneficiary, creditor beneficiary, and incidental beneficiary from Restatement of Contracts § 133 (1932).[14] Marlboro Shirt Co. v. American District Telegraph Co., 196 Md. 565, 569-70, 77 A.2d 776, 777-78 (1951); accord, Spates v. Spates, 267 Md. 72, 77, 296 A.2d 581, 584 (1972). A non-incidental third-party beneficiary may recover from the promisor under appropriate circumstances, even where the third party is not specifically referred to in the contract. Marlboro Shirt Co. v. American District Telegraph Co., 196 Md. at 571, 77 A.2d at 778. However, in order to recover as a third-party creditor beneficiary, a party must show that he was clearly intended to be the primary party in interest, to be the real promisee, to be privy to the promise. MacKubin v. Curtiss-Wright Corp., 190 Md. 52, 57-58, 57 A.2d 318, 321 (1948); accord, Hamilton & Spiegel, Inc. v. Board of Education, 233 Md. 196, 199-200, 195 A.2d 710, 711-12 (1963); Marlboro Shirt Co. v. American District Telegraph Co., 196 Md. at 569-71, 77 A.2d at 777-78. Where the third-party beneficiary is not named in the contract, the "intent" of the contract is to be garnered from the facts and circumstances surrounding its formation. Marlboro Shirt Co. v. American District Telegraph Co., 196 Md. at 571, 77 A.2d at 778. In determining the "intent" of the contract, predominant consideration is given to the intent of the promisee. See Shillman v. Hobstetter, 249 Md. 678, 689-90, 241 A.2d 570, 576 (1968) (quoting 4 Corbin on Contracts § 776 (2nd ed. 1964)).
 
 
 17
 Applying these legal principles to the case at bar, we must affirm the district court's summary judgment dismissing Joint Venture and Chevy Chase. The district court stated the applicable law succinctly and correctly: "The party asserting such status (third-party intended creditor beneficiary) must establish not only that the contract in question satisfied a duty owed to it by one of the contracting parties, but also that the satisfaction of that duty was the primary objective of the contract." Memorandum and Order of Oct. 30, 1973, J.A. at 93; see German Alliance Insurance Co. v. Home Water Supply Co., 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912); Ogden Development Corp. v. Federal Insurance Corp., 508 F.2d 583, 587-88, 587 n.17 (2nd Cir. 1974).
 
 
 18
 We shall consider Joint Venture's assertions first, as they may be disposed of expeditiously. Joint Venture has two basic contentions. First, it maintains that, by virtue of the deed of trust of April 11, 1969, it retained an equitable interest in the property and, by extension, in the development of the property. Brief for Appellees at 49. Second, it intimates that its direct dealings with Donohoe somehow confer the necessary third-party beneficiary status. Id. at 47.
 
 
 19
 In our view, both of these arguments miss the point. Nowhere in its pleadings, subsequent submissions, or brief does Joint Venture sufficiently articulate a specific duty owed to it by Winthrop. The burden at this stage was upon Joint Venture to establish such a duty. Joint Venture failed to discharge this burden. Not only did Joint Venture fail to satisfy the Mackubin "principal purpose" test, but it failed to meet the threshold "duty" test of the Restatement.
 
 
 20
 The bald assertion that Joint Venture retained an equitable interest in the property and its development is not equivalent to an assertion of a real or supposed legal duty. Many individuals and organizations undoubtedly had an interest in the successful completion of the motel. These individuals and organizations, like Joint Venture, are beneficiaries of the construction contract. However, they are only incidental beneficiaries. Incidental beneficiaries acquire no right to recover for breach of a contract. Bolick v. Board of Education, 256 Md. 180, 185, 260 A.2d 31, 33 (1969).
 
 
 21
 Similarly, the fact of extensive direct dealings with Donohoe is not legally sufficient to confer the necessary status on Joint Venture. The issue is not Donohoe's ongoing relations with Joint Venture, but Joint Venture's relation to the Winthrop-Donohoe contract.
 
 
 22
 Chevy Chase presents us with only a slightly more complicated problem. It urges that Winthrop, in entering the construction contract of May 6, 1969, was fulfilling a duty to construct the motel and related facilities, a duty found in the lease agreement of October 10, 1968. The district court summarized the arguments of Chevy Chase:
 
 
 23
 (T)here can be no doubt that Donohoe knew that Winthrop planned to lease the motel complex to a Holiday Inn franchisee. In all likelihood, Donohoe also knew that such a lease was already in existence, that Chevy Chase was the designated lessee, that as such it had participated extensively in the preparation of the plans for the complex, and that any delay or deficiencies in construction would injure Chevy Chase Associates as well as the lessor.
 
 
 24
 These factors, however, do not suffice to establish third-party beneficiary status.
 
 
 25
 Memorandum and Order of Sept. 13, 1973, J.A. at 87-88.
 
 
 26
 Once again, we are in complete agreement with the district court. As the trial judge suggested, the key is not Donohoe's knowledge, nor Chevy Chase's participation, but whether the clear intent of the promisee, Winthrop, as reflected by the surrounding facts and circumstances, was to make Chevy Chase the real promisee. From our examination of the record, we believe that Chevy Chase has not demonstrated the likelihood of its being able to prove such an intent. Even in its brief, Chevy Chase is able to do little more than proffer allegations relating to its past relations with Donohoe, its participation in the ongoing construction, its role in assisting Winthrop in its selection of Donohoe, and its arrangements with Joint Venture. Brief for Appellees at 46-49. Chevy Chase failed to carry its burden of demonstrating that Winthrop's primary objective in entering the contract with Donohoe was to satisfy its duty under the lease of October 10, 1968. There is no adequate demonstration that Chevy Chase was the real promisee. With regard to its third-party beneficiary claim, Chevy Chase has failed to raise a genuine issue of material fact, and Donohoe is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c).
 
 
 27
 This result, in our view, comports with precedent and with logic. In Marlboro Shirt, the Maryland Court of Appeals ruled that a tenant could not maintain suit on a contract between his landlord and a contractor. Accord, 2 Williston on Contracts § 402 (3d ed. 1968). See also Swift Lumber & Fuel Co. v. Hock, 124 Neb. 30, 245 N.W. 3 (1932). Greenlees v. Owens Ames Kimball Co., 340 Mich. 670, 66 N.W.2d 227, 46 A.L.R.2d 1205 (1954), is clearly distinguishable on the ground that the duty owed to the tenant was mentioned with specificity in the contract between the landlord and the contractor.
 
 
 28
 Further, in our case, the fact that Chevy Chase is not mentioned in the construction contract is itself probative in interpreting the facts. In view of Maryland precedent, especially Marlboro Shirt, and in view of the large amounts involved in this contract, it is highly probable that the parties would have given some indication in the contract itself if Chevy Chase had been intended to acquire the right to maintain an action on the contract.
 
 
 29
 III. LIMITED PARTNERSHIP AS SUCCESSOR OF WINTHROP
 
 
 30
 The district court found that Limited Partnership had the capacity to recover on the construction contract because Limited Partnership was the "successor-in-interest" of Winthrop. Although we agree with the result, we reach it by a route different than that chosen by the district court. The basic theory of the district court is that the right to enforce the construction contract is ancillary to the ownership of the property. Memorandum and Order of Nov. 19, 1974, J.A. at 101. As we comprehend the theory, the holder of the deed of trust is an alternative possessor of this right, but his right is inchoate until it matures at foreclosure. The foreclosure purchaser (here, Financial) will obtain the right and may transfer it. Presumably, the right attaches to the ownership of the improvements, and not to the title of the underlying land, since Limited Partnership was held to have capacity to recover on the construction contract even after the transaction between Limited Partnership and Peoples was disclosed to the district court. See id., J.A. at 99-103; Brief for Appellant at 18-19; Reply Brief of Appellant and Cross-Appellee at 2.
 
 
 31
 We must confess that we have been unable to locate any Maryland precedent that squarely supports or contradicts the district court's assertions that the intangible right to enforce the contract belongs to the owner of the underlying property, or that such right is held inchoate by the holder of a deed of trust. The theory of the district court is not that Limited Partnership succeeds directly to the right of Winthrop to sue on the contract to which Winthrop is a party. Rather, the district court holds that Limited Partnership succeeds to the rights of Joint Venture, the rights having passed through Financial. Memorandum and Order of Nov. 19, 1974, J.A. at 101. The premise is that, under the circumstances of this case, the owner of the property has the right to enforce a construction contract for the building located on his premises, although he is not in privity of contract with the promisor/contractor. Id.
 
 
 32
 The basic Maryland rule is that privity of contract is a prerequisite for recovery on that contract. Hand v. Evans Marble Co., 88 Md. 226, 40 A. 899 (1898); accord, Levy v. Glens Falls Indemnity Co., 210 Md. 265, 123 A.2d 348 (1956); Crane Ice Cream Co. v. Terminal Freezing & Heating Co., 147 Md. 588, 128 A. 280, 39 A.L.R. 1184 (1925). Although there have been certain obvious relaxations in this rule (e. g., third-party beneficiaries), we are not able to find a relaxation or exception that adequately supports the theory of the district court.
 
 
 33
 Joint Venture was not a party to the construction contract. The fact that Limited Partnership may have succeeded to its rights through Financial, does not, in our view, control this case. We do not deal with the district court's conclusion that Limited Partnership is the successor of Joint Venture, because we are not persuaded that Joint Venture had any right to which Limited Partnership could succeed. The question is not whether Limited Partnership succeeded Joint Venture, but whether Limited Partnership succeeded Winthrop.
 
 
 34
 Section 7.2.1 of the construction contract provides, in pertinent part: "The owner and the contractor each binds himself, his partners, successors, assigns, and legal representatives to the other party hereto and to the partners, successors, assigns, and legal representatives of such other party in respect to all covenants, agreements and obligations contained in the Contract Documents. . . ." Thus, Donohoe, as contractor, not only binds its own successors to Winthrop, but binds itself to the successors of Winthrop. The threshold question is thus whether Limited Partnership is a successor to Winthrop within the meaning of the contract and under Maryland law. We answer this question in the affirmative.
 
 
 35
 The word "successor" is not defined in the contract itself, nor can we find it adequately defined in Maryland precedent. We therefore must look outside of these sources to gather its meaning under Maryland law and in the expectation of the parties. Initially, we note that it is a word with many legal applications and that it is therefore difficult to define precisely. Recognizing this difficulty, Mr. Justice Marshall once remarked, "There is, and can be, no single definition of 'successor' which is applicable in every legal context." Howard Johnson Co. v. Hotel Employees, 417 U.S. 249, 263 n. 9, 94 S.Ct. 2236, 2243, 41 L.Ed.2d 46 (1974). See also Dynamic Machine Co. v. NLRB, 552 F.2d 1195, 1204 (7th Cir.), cert. denied --- U.S. ----, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); United States v. B. F. Sturtevant Co., 99 F.2d 72, 73-74 (1st Cir. 1938). To determine the meaning of "successor" in the area of labor law, Mr. Justice Marshall appears to endorse a case-by-case approach with emphasis on the facts of each case. 417 U.S. at 256, 262-63 n. 9, 94 S.Ct. 2236. The same fact-oriented approach has also been employed by courts in defining the limits of purely contractual successorship.[15] Van Deusen v. Ruth, 343 Mo. 1096, 1103, 125 S.W.2d 1, 4 (1938); Thompson v. North Texas National Bank, 37 S.W.2d 735, 739 (Tex.Com.App.1931); see Hand v. Evans Marble Co., 88 Md. at 229-31, 40 A. at 900.
 
 
 36
 In the non-labor contractual cases, "successor" has often been defined as "one who takes the place that another has left, and sustains the like part or character." Wawak Co. v. Kaiser, 90 F.2d 694, 697 (7th Cir. 1937); Citizens Suburban Co. v. Rosemont Development Co., 244 Cal.App.2d 666, 676, 53 Cal.Rptr. 551, 557 (1966); Van Deusen v. Ruth, 343 Mo. at 1103, 125 S.W.2d at 4; Thompson v. North Texas National Bank, 37 S.W.2d at 739; Black's Law Dictionary 1600 (rev. 4th ed. 1968). The definition goes beyond the borders of contract assignment and is used so as to obviate the need for express assumption of burdens. Citizens Suburban Co. v. Rosemont Development Co., 244 Cal.App.2d at 676, 53 Cal.Rptr. at 557. From an analysis of the facts of this case, it seems to us that with respect both to the construction contract itself and to the larger contractual framework, Limited Partnership "took the place" that Winthrop "had left" and "sustained the like part or character."
 
 
 37
 Focusing first on the construction contract itself, the basic obligation of Donohoe was to construct a motel. The basic obligation of Winthrop was to pay the contract sum of $3,400,000. Plaintiff's and Crossclaimant's Exhibit 3. When Winthrop could no longer meet its obligation on the contract and the deed of trust, the property was sold at foreclosure. Limited Partnership, as the assignee of the foreclosure purchaser, paid Donohoe's mechanic's lien in full. Of the $205,079.58, $184,419.46 represented the unpaid balance due on the original contract price, exclusive of any interest or other miscellaneous charges. Under the construction contract, it was the "part" of Winthrop to pay money. It was Limited Partnership who ultimately completed this obligation. Thus, with respect to the very obligations created by the construction contract itself, Limited Partnership occupied the place that Winthrop abdicated. Not only did Limited Partnership "sustain the like part" as Winthrop, it sustained the very same part as Winthrop.
 
 
 38
 The facts of the larger milieu in which the actors were operating also militate in favor of Limited Partnership's "successorship" status. At the time of the construction contract, Winthrop was not the record owner of the property, nor was it the actual owner. See Brief for Appellant at 16. It was an assignee of the lease of October 10, 1968. Memorandum and Order of Sept. 13, 1973, J.A. at 86; Reply Brief of Appellant and Cross-Appellee at 9. Thus, with regard to the underlying asset, the motel, Winthrop had a double obligation. On one hand, it assumed the lease agreement with Chevy Chase: on the other, it paid Donohoe on the construction contract. With regard to the underlying asset, we can see that Limited Partnership "sustained the like part or character" and had a nearly identical interest. See John Wiley & Sons v. Livingston, 376 U.S. 543, 551, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). After foreclosure and the transaction with Peoples, Limited Partnership did not have a fee interest in the underlying land. Nevertheless, as Donohoe points out, Chevy Chase was a subtenant of Limited Partnership pursuant to the lease of October 10, 1968. Brief for Appellant at 19. As discussed above, Limited Partnership dealt with Donohoe in the same role as Winthrop with regard to the construction contract. Thus, there is a high degree of similarity in role and interest between Winthrop and Limited Partnership. Under the facts presented by this case, therefore, we hold that Limited Partnership was the successor of Winthrop.
 
 
 39
 Donohoe contends that the bankruptcy trustee, by operation of federal bankruptcy law, has acquired all rights of action belonging to Winthrop under 11 U.S.C. § 110(a)(6) (1970). Brief for Appellant at 23. In the case at bar, however, Limited Partnership is not attempting to pursue a right of action belonging to Winthrop, but rather is attempting to pursue a right of action of its own under Maryland law and section 7.2.1 of the construction contract.
 
 
 40
 It can be seen by an examination of the contract itself that, in the rather commonplace event of bankruptcy, the contract does not contemplate the bankruptcy trustee by use of the word "successor" in section 7.2.1. Section 7.6.1 states: "The duties and obligations imposed by the Contract Documents, and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed or available by law." To the extent that the rights of the bankruptcy trustee are available, they are available by operation of federal law. Further, section 14.2.1[16] allows the owner to terminate the employment of the contractor if the contractor is adjudged a bankrupt. If the bankruptcy trustee were intended to be the "successor" under the contract, section 7.2.1 would have no force when read with section 7.6.1, and would be clearly inconsistent with section 14.2.1.
 
 
 41
 Where, as here, a party has bound himself by contract to the "successor" of another, and a third person is clearly the "successor" of the other, common sense would seem to dictate that the "successor" could defeat the privity defense of the promisor merely by pointing to the very words of the contract. As we are attempting to follow Maryland law, however, we cannot blithely assume this result.
 
 
 42
 A leading Maryland case in the area of contractual successorship is Hand v. Evans Marble Co. In that case, the court denied contractual recovery to the plaintiff, an assignee of one party to a contract, against defendant, a successor to the other party to the same contract. In that case, the defendant's lack of privity defense prevailed. However, there are a number of important differences between Hand and the case at bar. First and foremost, no consideration moved from the plaintiff to the defendant in that case. This is, of course, completely unlike our own case where a substantial sum was paid by the plaintiff to the defendant. The court in Hand recognized that this was not only an important factor, but determinative:
 
 
 43
 So, also, where defendants, who had been in the habit of dealing with B., sent a written order for goods, directed to B.; the plaintiff, who on that day had bought B.'s business, executed the order without notice to defendants. It was held that plaintiff could not maintain an action for the price of the goods against the defendant; Bramwell, B., saying: "As to the difficulty that the defendants need not pay anybody, I do not see why they should, unless they have made a contract, either express or implied." (Citation omitted) If, in that case, defendants had accepted the goods with knowledge of the facts, doubtless they would have been held liable upon an implied assumpsit.
 
 
 44
 88 Md. at 230, 40 A. at 900 (emphasis added). So, it appears to us, that even eighty years ago, an acceptance of a successor's counterperformance with knowledge would be sufficient to bind a promisor. There can be no doubt that these two elements have been fulfilled in the facts of the instant case. Donohoe accepted the counterperformance of Limited Partnership by accepting payment. Further, it cannot be doubted that Donohoe knew that it was accepting payment from someone other than Winthrop, the original party to the contract. Indeed, by filing the mechanic's lien, Donohoe was inviting the performance of someone other than the bankrupt Winthrop or its trustee. It seems to us that Donohoe was actually seeking a successor to assume the role of Winthrop under the construction contract.
 
 
 45
 It is important to realize that, in the hypothetical situation contained in the passage from Hand set out above, the successor acquired his rights through a theory of rescission and subsequent implied contract. 88 Md. at 229, 40 A. at 900. This hypothetical situation substitutes a party purely by operation of law. We need not resort to operation of law: we need only give effect to the words of section 7.2.1 of the contract.
 
 
 46
 Finally, it is important to recall the posture in which the claim of "successorship" arises. As in the labor successorship cases noted previously, Hand involves an action against an alleged successor based upon an undertaking entered into by his predecessor. The law is, of course, reluctant to cast burdens upon a "successor" who may not have agreed to accept them. Nonetheless, the Maryland Court of Special Appeals, in Roberts v. Gates, 24 Md.App. 374, 330 A.2d 705 (1975), has upheld such "bootstrapping" of a "successor" as an alternative theory of recovery, although the court questioned the essential wisdom of allowing it. We reiterate that our case does not involve "bootstrapping" a successor with contractual responsibility: our case involves the liability of an original party to a successor. If an original party can bind a successor, it seems to us that, a fortiori, a successor should be able to bind an original party. In the case at bar, we need not fear casting an unbargained and unexpected obligation on Limited Partnership because there is no allegation that Winthrop's obligation has not been completely discharged.
 
 
 47
 The Maryland Court of Appeals has stated: "It is an ancient rule of the common law that a person who did not enter into a contract, or succeed to the interest of those who did, has no right of action for its breach, although he sustained damage thereby." Levy v. Glens Falls Indemnity Co., 210 Md. at 270, 123 A.2d at 351 (emphasis added). We interpret this as an express affirmation of the principle that a proper successor may have a right of action against an original party. We therefore hold that Limited Partnership, as successor to Winthrop, has a right of action against Donohoe for breach of the construction
 
 
 48
 contract of May 6, 1969. IV. DONOHOE'S LIABILITY IN
 
 CONNECTION WITH THE SUBSTITUTION OF STAINLESS
 STEEL FOR COPPER WATER PIPES
 
 49
 One of the major damage issues in this case concerns the substitution of stainless steel for copper water risers. Donohoe admits that the contract calls for copper piping in the domestic water risers, that an unknown number of stainless steel risers were installed in place of the copper risers specified, that there were leaks in the stainless steel risers, and that Chevy Chase paid to have the leaks repaired. Reply Brief of Appellant and Cross-Appellee at 12. It is not contested that there was no written change order. Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 107. The district court nevertheless found for Donohoe on this issue, holding that no written change order was necessary.[17] Id., J.A. at 107-10. We must affirm.
 
 
 50
 Article 12 of the construction contract governs changes in the work. There are two basic procedures contemplated. Sections 12.1.1[18] and 12.1.2[19] govern major changes and contemplate written, formal Change Orders, generally to be signed by the owner. Section 12.3.1[20] governs minor changes and appears to us generally to contemplate written orders signed by the architect. Although there is some doubt as to which procedure governs this case, we need not reach this question. As the district court noted, if a written order were required by the contract, the contractual requirement was waived by the subsequent conduct of the parties. Id.
 
 
 51
 It is well-settled that Maryland law permits an implied waiver to a provision in a construction contract that requires written change orders. Arc & Gas Welder Associates v. Green Fuel Economizer Co., 285 F.2d 863, 868-69 (4th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); Freeman v. Stanbern Construction Co., 205 Md. 71, 79, 106 A.2d 50, 55 (1954); accord, Hoffman v. Glock, 20 Md.App. 284, 315 A.2d 551 (Ct.Spec.App.1974). See also United States v. Gilman, 360 F.Supp. 828 (D.Md.1973); Sullivan v. Mosner, 266 Md. 479, 295 A.2d 482 (1972). An implied waiver will suffice to supplant a provision requiring written modification if it is made knowingly and proved by a preponderance of the evidence. Freeman v. Stanbern Construction Co., 205 Md. at 79, 106 A.2d at 55.
 
 
 52
 The district court found that Gordon, the architect, had given oral approval to the substitution and that Winthrop acquiesced in the substitution. From these facts, the district court inferred a waiver. Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 109-10. Based upon our examination of the record, we believe that these findings are legally sufficient and factually correct. The diary entry of Marshall (Defendant's Exhibit 7), the testimony, and Gordon's handwritten notation of approval on Marshall's letter dated March 6 (Plaintiff's and Crossclaimant's Exhibit 50) all provide evidence that Gordon had given his approval in March 1970. From these facts and from the testimony concerning the March 17 meeting, the district court could fairly imply a waiver from Winthrop.
 
 
 53
 Whether such a waiver took place is a question of fact. Of course, our review in questions of fact is necessarily limited: we are not to overturn a finding of fact unless it appears to us that it is "clearly erroneous." Fed.R.Civ.P. 52(a). With respect to this issue, we do not see "error," much less "clear error." Therefore, we affirm.
 
 V. THE MEASURE OF DAMAGES
 
 54
 Donohoe, relying heavily on Wentworth v. Air Line Pilots Association, 336 A.2d 542 (D.C.App.1975), urges that the proper measure of damages for injury to property which is sold is the diminution in value rather than the replacement cost. Brief for Appellant at 25; Reply Brief of Appellant and Cross-Appellee at 5-6. In our view, Donohoe's reliance is misplaced for two reasons. First, Wentworth involved damages for tortious injury. Clearly, damages for breach of a construction contract differ from damages in tort. Second, in Wentworth, the plaintiff had sold the land, and the court relied on the plaintiff's inability to make repairs in deciding upon the diminution in value measure for damages. 336 A.2d at 544. In our case, it is true that Limited Partnership sold the underlying property to Peoples. However, Limited Partnership, unlike the plaintiff in Wentworth, possesses a quitclaim deed to the improvements. It appears that Limited Partnership has not lost its ability to make repairs. Thus, the rationale behind Wentworth is not applicable.
 
 
 55
 The relevant Maryland rule appears to be that the plaintiff is entitled to replacement costs, unless it is impracticable or unreasonable to make the changes, in which case he is entitled to diminution in value. Gilbert Construction Co. v. Gross, 212 Md. 402, 411, 129 A.2d 518, 522 (1957); accord, Sainato v. Potter, 222 Md. 263, 270, 159 A.2d 632, 636 (1960); 11 Williston on Contracts § 1363 (3d ed. 1968). See generally Restatement of Contracts § 346 (1932); see also Baltimore Federal Savings & Loan Association v. Gordon, 272 Md. 52, 58-60, 321 A.2d 157, 162 (1974); Hooten v. Kenneth B. Mumaw Plumbing & Heating Co., 271 Md. 565, 573-74, 318 A.2d 514, 518-19 (1974); Correlli Roofing Co. v. National Instrument Co., 240 Md. 627, 632-33, 214 A.2d 919, 921-22 (1965); 5 Corbin on Contracts § 1089 (1964). With respect to the items of damage awarded, we cannot see a sufficient showing of impracticability to trigger the diminution in value measure. However, it appears that Donohoe relies principally on Wentworth and on the fact of the sale to Peoples to support its diminution in value argument. For the reasons stated above, we feel that Wentworth is inapposite to the case at bar.
 
 VI. THE DAMAGE FINDINGS
 
 56
 This court has held that a damage award is a finding of fact governed by Fed.R.Civ.P. 52(a), and is not to be disturbed unless it is determined to be "clearly erroneous". Miles v. District of Columbia, 166 U.S.App.D.C. 235, 243, 510 F.2d 188, 196 (1975). In order for us to make such a determination, it is necessary that findings concerning damages "be made with sufficient particularity so that they may be reviewed." Hatahley v. United States, 351 U.S. 173, 183, (76 S.Ct. 745, 752, 100 L.Ed. 1065) (1956) (damages under Federal Tort Claims Act); Alexander v. Nash-Kelvinator Corp.,261 F.2d 187, 190-91 (2nd Cir. 1958) (damages under Fed.R.Civ.P. 52). Where, as here, there is great controversy regarding the measure and computation of damages, see Transcript 742-814, it is important that the measure of damages and method of computation be exposed so as to inform the litigants and afford a possibility of intelligent review. See Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 590, 96 A.L.R.2d 1085, 1095 (2nd Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526, 370 U.S. 937, 82 S.Ct. 1577, 8 L.Ed.2d 806 (1962); Alexander v. Nash-Kelvinator Corp., 261 F.2d at 191.
 
 
 57
 With respect to the vinyl wall coverings, the district court awarded Limited Partnership $47,500 for "cosmetic" and other compensation. Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 111. There is no definite indication what measure of damages was used or what figures went into the calculation. Counsel for Chevy Chase and Limited Partnership noted at oral argument that this figure might have been derived by adding the $41,000 that Donohoe paid for the wall coverings (Transcript at 376) to the $6,500 estimated cost of priming the walls (Transcript at 396; Plaintiff's and Crossclaimant's Exhibit 26). This could be the way the award was calculated, but, also, it could well be coincidence. We are capable of no more than pure speculation. Moreover, there is an indication that the district court may have experienced considerable difficulty regarding the measure of damages. Transcript at 791-92. Additionally, there was at least a partial failure of proof regarding the cost of replacement with similar wall coverings. Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 110; Transcript at 749-52.
 
 
 58
 The same problem is present in the award of $3,500 for the missing master thermostat, Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 112, and the award of $17,000 for leak damages. Id., J.A. at 113. We feel that we are unable to make an adequate review of these damage awards, and we must remand for a further articulation of the way that they were calculated.[21]
 
 VII. CONCLUSION
 
 59
 For the foregoing reasons, we affirm the district court's determinations with regard to the capacity issues and with regard to liability, but we remand for a further illumination concerning the damage issue.
 
 
 60
 Affirmed in part and Remanded in part.
 
 
 
 [1]
 The related facilities are a parking garage and restaurants. Also included on the property, but not leased to Chevy Chase, are several retail stores
 
 
 [2]
 At about this time, a second group, the Somerset Properties Limited Partnership, began to emerge. A certificate for this limited partnership was not filed until August 16, 1971. There is a sometimes confusing similarity between Somerset Properties Joint Venture and Somerset Properties Limited Partnership. Safer and Stephen Winkelman were principals of both and apparently acted for both. The real estate sales contract of February 11, 1969, is signed, inter alia, by John Safer, Stephen Winkelman, and Jules A. Winkelman. In this contract, Safer and the two Winkelmans purport to be acting for Somerset Properties Limited Partnership
 On the other hand, the lease agreement of October 10, 1968 is signed by Stephen Winkelman and Safer, purporting to be acting in their individual capacities, and for the participants in the Somerset Properties Joint Venture. We can find no evidence in the record of any transfer of title from Somerset Properties Joint Venture to Somerset Properties Limited Partnership between October 10, 1968 and February 11, 1969.
 
 
 [3]
 The note is for $2,000,000 and is made to the order of Safer and Stephen A. Winkelman. It is guaranteed by Copeland. Securing the note is a deed of trust given by Winthrop, also bearing the date of April 11, 1969. In addition, there existed a first lien of record in the form of a deed of trust securing a debt to Madison National Bank of approximately $5,000,000
 
 
 [4]
 The district court noted that the fact that Winthrop transferred the property to Copeland combined with the fact that Winthrop purchased and sold by deeds dated the same day to suggest very strongly that the transaction with Winkelman and Safer preceded the transaction in which Winthrop purportedly granted the property to Copeland. Memorandum and Order of Nov. 19, 1974, J.A. at 102. Although we do not disagree with this assessment, our analysis of the capacity issues does not in any way depend on a similar resolution of the facts
 
 
 [5]
 Donohoe went ahead apparently on the basis of a letter from Stephen Winkelman to its president, Richard Donohoe, dated April 23, 1969. This was apparently done to protect a Special Zoning Exception
 
 
 [6]
 The total contract price was $3,400,000. During the construction, certain changes were apparently agreed to which added an additional $57,136.46. As of the filing of the lien, Donohoe recites that it had received $3,272,717. Thus, the unpaid balance was $184,419.46
 
 
 [7]
 The property was sold subject to the first deed of trust the balance of which was $4,832,502.67, including counsel fees and miscellaneous charges. The property was sold subject to the leases of the Holiday Inn and the retail stores. In addition, there were overdue taxes of $70,601.20, a lien for the architect in the amount of $22,889.89, and a lien for the structural engineer of $8,500. When Donohoe's lien is added in, the total is $5,149,013.23. There were also numerous, smaller, and less certain charges against the property. The equity sold to Financial Underwriters, Ltd. for $2,050,000
 
 
 [8]
 See note 2 supra
 
 
 [9]
 The principal amount was $184,419.46. See note 6 supra. The difference consisted of interest from January 13, 1971 and certain other miscellaneous claims of Donohoe. Donohoe released its lien on August 31, 1971
 
 
 [10]
 Jurisdiction is pursuant to D.C.Code § 11-501(4) (1973), 28 U.S.C. § 2201 (1970) and 9 U.S.C. § 4 (1970)
 
 
 [11]
 Donohoe referred specifically to the grant of property from Winthrop to Copeland in its Mechanic's Lien Claim of May 5, 1971
 
 
 [12]
 Section 7.1.1 provides, "The contract shall be governed by the law of the place where the project is located."
 
 
 [13]
 It was not contested that Maryland law should be applied and the district court so held. Memorandum and Order of Mar. 11, 1974, J.A. at 96-98; see Memorandum Opinion and Order of Nov. 27, 1974, J.A. at 104-14. We agree
 
 
 [14]
 Restatement of Contracts § 133 is as follows:
 (1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, except as stated in Subsection (3):
 (a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary;
 (b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the Statute of Limitations or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds;
 (c) an incidental beneficiary if neither the facts stated in Clause (a) nor those stated in Clause (b) exist.
 (2) Such a promise as is described in Subsection (1a) is a gift promise. Such a promise as is described in Subsection (1b) is a promise to discharge the promisee's duty.
 (3) Where it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee is to benefit a beneficiary under a trust and the promise is to render performance to the trustee, the trustee, and not the beneficiary under the trust, is a beneficiary within the meaning of this Section.
 
 
 [15]
 We realize that labor successorship questions are interpreted against a backdrop of national labor policy, and therefore, the same principles and policies do not necessarily carry over into the case at bar. John Wiley & Sons v. Livingston, 376 U.S. 543, 550, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). See also NLRB v. Burns Int'l Security Servs., Inc., 406 U.S. 272, 285, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); Comment, Contractual Successorship: The Impact of Burns, 40 U.Chi.L.Rev. 614 (1973)
 There is another very important difference. In these labor successorship cases, the question is generally whether a subsequent entity will be bound by legal obligations created by an alleged predecessor. Howard Johnson Co. v. Hotel Employees, 417 U.S. at 262 n. 9, 94 S.Ct. 2236. The question in our case is not whether a successor will have his predecessor's obligations imputed to him, but, on the contrary, whether he may take advantage of his predecessors's contract.
 
 
 [16]
 Section 14.2.1 provides in full:
 If the Contractor is adjudged a bankrupt, or if he makes a general assignment for the benefit of his creditors, or if a receiver is appointed on account of his insolvency, or if he persistently or repeatedly refuses or fails, except in cases for which extension of time is provided, to supply enough properly skilled workmen or proper materials, or if he fails to make prompt payment to subcontractors or for materials or labor, or persistently disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or otherwise is guilty of a substantial violation of a provision of the Contract Documents, then the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may, without prejudice to any right or remedy and after giving the Contractor and his surety, if any, seven days' written notice, terminate the employment of the Contractor and take possession of the site and of all materials, equipment, tools, construction equipment and machinery thereon owned by the Contractor and may finish the Work by whatever method he may deem expedient. In such case the Contractor shall not be entitled to receive any further payment until the Work is finished.
 
 
 [17]
 Limited Partnership, Joint Venture, and Chevy Chase each attempt to advance express and implied warranty claims on appeal. Brief for Appellees at 60-69. We do not find merit in these claims. The extent to which Maryland has eliminated privity as a requirement to warranty claims is not fully clear, especially in cases not involving sales of goods. Compare Blankenship v. Morrison Mach. Co., 255 Md. 241, 257 A.2d 430 (1969), with Frericks v. Gen. Motors Corp., 278 Md. 304, 363 A.2d 460 (1976). To the extent privity is required, Joint Venture and Chevy Chase are not plaintiffs who may recover, as we discussed above. It is unclear whether Limited Partnership as "successor" could defeat Donohoe's privity defense with regard to warranty. See Uppgren v. Executive Aviation Servs., Inc., 326 F.Supp. 709, 713-17 (D.Md.1971)
 Based on our review of the record, we must agree with Donohoe that this case was not tried on a warranty theory below. See Reply Brief for Appellant and Cross-Appellee at 13 n. 8. The plaintiff and crossclaimant have not carried their burden with respect to the defect in the pipe. Great Atl. & Pac. Tea Co. v. Adams, 213 Md. 521, 132 A.2d 484 (1957); accord, Hacker v. Shofer, 251 Md. 672, 248 A.2d 351 (1968). Further, we can find no sufficient legal basis for a finding of an implied warranty. See Thomas v. Cryer, 251 Md. 725, 248 A.2d 795 (1969). But see Md. Real Property Code Ann. § 10-203 (1974) (implied warranties with respect to sales). Finally, the participation of Winthrop and Gordon in the substitution of stainless steel for copper pipes is most significant. See Wisconsin Red Pressed Brick Co. v. Hood, 67 Minn. 329, 69 N.W. 1091 (1897); Wood-Hopkins Contracting Co. v. Masonry Contractors Inc., 235 So.2d 548, 61 A.L.R.3d 786 (Fla.Dist.Ct.App.1970). See also Mattos, Inc. v. Hash, Md., 368 A.2d 993 (1977); Erdman v. Johnson Bros. Radio & Television Co., 260 Md. 190, 271 A.2d 744 (1970).
 
 
 [18]
 Section 12.1.1 provides in full:
 The Owner, without invalidating the Contract, may order Changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and the Contract Time being adjusted accordingly. All such Changes in the Work shall be authorized by Change Order, and shall be executed under the applicable conditions of the Contract Documents.
 
 
 [19]
 Section 12.1.2 provides in full:
 A Change Order is a written order to the Contractor signed by the Owner and the Architect, issued after the execution of the Contract, authorizing a Change in the Work or an adjustment in the Contract Sum or the Contract Time. Alternatively, the Change Order may be signed by the Architect alone, provided he has written authority from the Owner for such procedure and that a copy of such written authority is furnished to the Contractor upon request. A Change Order may also be signed by the Contractor if he agrees to the adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time may be changed only by Change Order.
 
 
 [20]
 Section 12.3.1 provides in full:
 The Architect shall have authority to order minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes may be effected by Field Order or by other written order. Such changes shall be binding on the Owner and the Contractor.
 
 
 [21]
 See 11 Williston on Contracts § 1363, at 344-48 (3rd ed. 1968)